# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jodi Lee Snyder,                                    Civ. No. 12-3104 (MJD/JJK)

          Plaintiff,

v.

Carolyn W. Colvin,                                  **REPORT AND**
Acting Commissioner of                              **RECOMMENDATION**
Social Security,

          Defendant.

Neut L. Strandemo, Esq., Strandemo Sheridan & Dulas, PA, counsel for Plaintiff.

Anna H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Jodi Lee Snyder

seeks judicial review of the final decision of the Commissioner of Social Security

("the Commissioner"), who denied Plaintiff's applications for disability insurance

benefits and supplemental security income.  The parties have filed cross-motions

for summary judgment.  (Doc. Nos. 9, 15.)  This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

D. Minn. LR 72.1.  For the reasons stated below, this Court recommends that

Plaintiff's motion be denied and Defendant's motion be granted.

## BACKGROUND

### I.   Procedural History

Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on August 4, 2009, alleging a disability onset of January 1, 2001.  (Tr. 72–73, 173.)[1]  The Social Security Administration ("SSA") denied the applications initially and on reconsideration.  (Tr. 72–75, 76–78.)  Plaintiff then requested a hearing in front of an Administrative Law Judge ("ALJ"), which was held on June 13, 2011.  (Tr. 93–94, 28.)  On June 23, 2011, the ALJ issued an unfavorable decision.  (Tr. 8–21.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied her request for review on October 15, 2012.  (Tr. 1.)  The Appeals Council's denial made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

On December 13, 2012, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  (Doc. No. 1.)  The parties thereafter filed cross-motions for summary judgment.  (Doc. Nos. 9, 15).

---

[1]     Throughout this Report and Recommendation, reference to the Administrative Record (Doc. No. 7), for this case is made by using the abbreviation "Tr."

## II.    Factual Background

Plaintiff was born on March 22, 1983.  (Tr. 173.)  At the time of her alleged onset of disability on January 1, 2001, she was seventeen years old, although she claims to have been suffering from the maladies that form the basis of her claim essentially her entire life.  (Tr. 173, 30.)  Plaintiff has a high school diploma and participated in a two-year program at a vocational-technical school to learn basic life skills.  (Tr. 34–35.)  Plaintiff has worked as a door greeter at Wal-Mart, a grocery bagger and cart pusher at Econofoods, and as an employee at Subway.  (Tr. 233–37.)  In her applications for disability and supplemental income, Plaintiff alleged disability due to adjustment disorder, anxiety, borderline intellectual functioning, obsessive-compulsive traits, developmental cognitive disability, depression, impulse-control problems, and vulnerability.  (Tr. 74–75, 78.)

### Medical History

The following is a summary of the relevant medical records found in the administrative record before the Court.

In 2001, Plaintiff underwent an evaluation consisting of a battery of tests to measure her cognitive abilities, which was conducted by the Farmington School District and reported on November 12, 2001.  (Tr. 283–86.)  The evaluation concluded that Plaintiff had a full scale IQ of 74, which put her within the "Borderline" range among other 18 and 19-year-olds.  (Tr. 283.)  She also

displayed issues with vulnerability in personal relationships due to her desire to please others.  (Tr. 286.)

Several years later, on April 14, 2004, Plaintiff underwent a psychological evaluation by Dr. Spencer Olson of the Associated Clinic of Psychology to assess her cognitive and adaptive functioning.  (Tr. 445–48.)  This was Plaintiff's first psychological evaluation conducted outside of the school system.  (Tr. 445.)  Her full scale IQ was measured to be 79, which is consistent with her previous evaluation performed by the school district.  (Tr. 446.)  Dr. Olson also noted her mood swings and concluded that Plaintiff was a vulnerable adult.  (Tr. 446, 448.)  Additionally, Dr. Olson noted indications of obsessive-compulsive disorder ("OCD"), particularly surrounding her relationship with her boyfriend, and recommended a referral to a psychiatrist for more thorough assessment.  (Tr. 448.)  At that time Plaintiff's Global Assessment of Functioning ("GAF")[2] score was measured at 65.  (*Id.*)

Approximately four and a half years after that, on November 14, 2008, Dr. Christopher Balgobin evaluated Plaintiff with respect to her depressive

---

[2]  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 30-32 (4th ed. 1994).  The GAF scale is used to measure an individual's overall level of functioning concerning psychological, social, and occupational functioning at the time of evaluation.  A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas," a GAF of 41 to 50 indicates "[s]erious symptoms" or "any serious impairment," a GAF of 51–60 indicates "[m]oderate symptoms" or "moderate difficulty," a GAF of 61-70 indicates "some mild symptoms" or "some difficulty," and a GAF of 71-80 indicates only "transient" symptoms or "expectable reactions to psychological stressors."

symptoms. (Tr. 306–07.) Plaintiff reported that beginning six months prior to her visit, she had been experiencing feelings of worthlessness, diminished interest or pleasure in activities, and other depressive symptoms. (Tr. 306.) She denied any hallucinations and exhibited a normal affect. (Tr. 307.) Dr. Balgobin noted that Plaintiff "appeared to be well-oriented in all spheres with coherent, logical, goal directed and relevant thinking," and that her affect was "normal/appropriate" and her "emotional attitude was open and cooperative." (*Id.*) At that time, Plaintiff agreed to take Prozac and visit a counselor for her depression. (*Id.*)

From approximately August 2008 through April 2011, Plaintiff saw therapist Joanne Nahem. (*See* Tr. 359–92, 449–50, 477.) Ms. Nahem is an MA, LP, meaning she is a licensed psychologist trained at the masters level. On September 14, 2009, after Plaintiff had applied for disability benefits and on a referral from Ms. Nahem, Plaintiff underwent a diagnostic assessment performed by Dr. Reiko Tanaka upon a referral from Joanne Nahem. (Tr. 449–57.) Plaintiff scored a 74 on the full scale IQ test administered, which meant she again fell in the borderline range of cognitive function. (Tr. 453). Plaintiff's test scores also indicated moderate symptoms of both depression and anxiety. (Tr. 455.) Dr. Tanaka noted that Plaintiff "is likely to be quite insecure in personal relationships. She may be hypersensitive to rejection and she tends to need a great deal of reassurance." (Tr. 455.) Additionally, Dr. Tanaka agreed with the diagnosis of anxiety disorder and listed Plaintiff's GAF at 65, while at the same

time noting that Plaintiff has "great" personal and domestic daily living skills. (Tr. 456.)

On January 21, 2010, Plaintiff was assessed by Robert Lopno, a licensed psychologist, for the purpose of her seeking disability benefits "due to the effects of her depressed mood, anxiety, and 'learning' problems." (Tr. 397–99.) Mr. Lopno concluded that Plaintiff was suffering from dysthymia (i.e., depression), adult onset; PTSD; panic disorder without agoraphobia; borderline intellectual functioning; and had a GAF of 48. (Tr. 399.) He further noted that Plaintiff was "able to understand, remember, and follow at least rehearsed instructions; sustain adequate attention and concentration; carry out work-like tasks with reduced to adequate persistence and pace; respond appropriately to brief and superficial contact with co-workers and supervisors; and tolerate only mild stress and pressure typically found in an entry-level work place . . . ." (Tr. 399.) On January 26, 2010, after consideration of Mr. Lopno's consultative examination, among other reports, the Social Security Administration denied Plaintiff's disability applications. (Tr. 72–74.)

On March 14, 2011, Plaintiff visited the Associated Clinic of Psychology to discuss possible changes to the medication she was taking for her mental issues. (Tr. 474.) At that time, Plaintiff reported panic symptoms, shortness of breath, chest pain, generalized anxiety, difficulty concentrating, and sleep problems. (*Id.*) Kathi Lietzau, the Nurse Clinical Specialist who conducted the examination, noted that Plaintiff endorsed some obsessive thinking and compulsive behaviors

and would become anxious and upset if her routines were interrupted. (Tr. 475.)
Ms. Lietzau concluded that Plaintiff should continue on the Prozac as well as
start taking the drug BuSpar to help with her anxiety. (*Id.*)

The Social Security Administration denied Planitiff's disability applications
on reconsideration on April 16, 2010. (Tr. 75–77.) Upon Plaintiff's request a
hearing was then scheduled in front of an ALJ for June 13, 2011. (*See* Tr. 93–94,
28.) Within a couple weeks before that hearing, Plaintiff underwent psychological
evaluations on May 26 and June 8, 2011, to determine her competency to
proceed in a criminal case where she allegedly furnished cigarettes and alcohol
to a 14-year-old neighborhood boy. (Tr. 479–87.) Dr. Katheryn Cranbrook, a
senior clinical forensic psychologist, performed the evaluation and noted that
Plaintiff showed significant cognitive limitations and symptoms of depression and
anxiety. (Tr. 485.) As a result, Dr. Cranbrook concluded that Plaintiff was not
competent to proceed with regard to the criminal charges. (*Id.*)

## III.    Testimony at Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified to the following at a hearing before the ALJ on June 13,
2011. (Tr. 28–49.) Plaintiff was twenty-eight years old and had completed high
school and two years at a vo-tech school. (Tr. 34.) At the vo-tech school,
Plaintiff attended a TESA program that teaches life skills to students with learning
disabilities. (Tr. 34–35.) During high school, Plaintiff worked as a baker at
Econofoods. (Tr. 35.) After that, she worked at Wal-Mart for nearly six years

primarily greeting customers and handing out carts for about 15-20 hours per week. (*Id.*) She would work anywhere from 5-8 hours in a day. (Tr. 41.) Plaintiff attempted to work as a cashier at Wal-Mart but her difficulties with math and inability to accurately make change for customers made the position a bad fit for her. (Tr. 36.) Plaintiff had just started a new job at Subway at which she worked about ten hours per week, but found it very difficult due to the fast pace of the work. (Tr. 37.) Plaintiff stated that she could not work a full day without getting very tired and experiencing anxiety spells or bouts of dizziness. (Tr. 42.) She estimated that during her last couple months working at Wal-Mart she would miss ten days of work per month due to lack of sleep and panic attacks brought on from being asked to perform different tasks. (*Id.*) She does not feel that she could work a full-time job due to the fact that she moves quite slowly. (Tr. 46.)

Plaintiff was married for a time and gave birth to two children, aged three and five at the time of the hearing. (Tr. 37.) She stated that she takes care of her children when she is not working but does need help from others at times because she feels overwhelmed when her schedule is disrupted. (Tr. 38.) Plaintiff describes her overwhelmed feeling as an anxiety attack that is marked by dizzy spells, tremors, and headaches. (*Id.*) She stated that she suffers these anxiety attacks both at home and at work, and they occur at least once a day. (*Id.*) Plaintiff does not drive and relies on parents, friends, and neighbors to get around. (Tr. 40.) Plaintiff also stated that she has trouble sleeping, which causes her to have low energy during the day. (*Id.*)

Plaintiff stated that her primary doctor is her family doctor, Dr. Christopher Balgobin, who treats both her and her children.  (Tr. 43.)  In addition, she testified that she saw Joanne Nahem for treatment of her anxiety and depression a couple times a month.  (*Id.*)

Plaintiff testified that in a typical day, she would get up around 8:00 or 8:30 in the morning, give her kids a bath, get them dressed, and feed them breakfast.  (Tr. 41.)  When not working, Plaintiff would spend her time at home watching TV or reading a book.  (Tr. 44.)  She also stated that she plays computer games at least once a day, for at least three hours.  (Tr. 47.)  She does not do much cooking but does try to do the cleaning and laundry on her own.  (Tr. 44–45.)  Plaintiff's mother visits her four to five days a week and provides an allowance for her to live on.  (Tr. 45, 47.)  Child Protective Services has not been involved with Plaintiff's family other than when Plaintiff's husband was abusing her children prior to their divorce.  (Tr. 46.)  Plaintiff does receive food stamps, but does not receive housing assistance.  (Tr. 48.)  Plaintiff has a checking account, but has had issues managing her money and does not have a credit card.  (*Id.*)

### Testimony by Julie Scherbenske

Julie Scherbenske, Plaintiff's mother and legal guardian, testified to the following at the hearing.  (Tr. 49–65.)  Ms. Scherbenske testified that Plaintiff would miss one to two days of work per week and required support in order to get to work on time each day.  (Tr. 50.)  She also stated that Plaintiff might benefit from a more rigid working schedule in which she started work at 9:00 in

the morning every day because it would be more of a routine for her, but working full-time, five days a week would be too overwhelming. (Tr. 51.) She stated that Plaintiff has been highly concerned with routine her entire life. (Tr. 51–52.) Ms. Scherbenske testified that Plaintiff requires help in raising her children from her mother and her neighbor. (Tr. 52–53.) Also, Ms. Scherbenske has had a conservatorship over Plaintiff since 2002, which she renews every year, and she manages Plaintiff's finances, but Ms. Scherbenske does not have a conservatorship over Plaintiff's children. (Tr. 53–54, 59.) Ms. Scherbenske also receives any financial aid given to Plaintiff's children and is responsible for taking Plaintiff's children to any medical appointments they might need. (Tr. 55–56.)

Ms. Scherbenske also testified that Plaintiff has been diagnosed with obsessive-compulsive disorder, which has caused Plaintiff to be highly concerned with maintaining routine and to repeatedly ask for forgiveness. (Tr. 60–61.) Ms. Scherbenske confirmed that Plaintiff has trouble sleeping and she stated that Plaintiff experiences pounding heartbeats. (Tr. 62.) Ms. Scherbenske also stated that she does not monitor Plaintiff's computer use but was aware of Plaintiff's use of eHarmony, an online dating website. (Tr. 63–64.)

### Vocational Expert

Norman Mastbaum testified as a vocational expert at the hearing. (Tr. 65–70.) He stated that Plaintiff's work at Wal-Mart, Subway, the grocery store, and the bakery all require significant contact with the public and have a specific

10

vocational preparation ("SVP") score of two.  (Tr. 65.)  The ALJ asked Mastbaum

what type of work a person with the following restrictions could perform: young,

with a high school education, no physical limitations, "limited to performing

simple, routine, repetitive work with one- or two-step instructions[,]" in a

"supervised, low-stress environment requiring few decisions[,]" and limited to only

brief, infrequent (one to two contacts per work period), and superficial interaction

with the public, coworkers, and supervisors."  (Tr. 66–67.)  Mastbaum responded

that there were positions in the economy for a person with those limitations, such

as a press tender,[3] unscrambler,[4] and conveyor off bearer.[5]  (Tr. 67–68.)

However, if the additional limitation of needing hourly redirection were added to

the previous hypothetical, Mastbaum testified that those jobs would not be

available.  (Tr. 69.)  Mastbaum further stated that all the jobs he mentioned would

require full-time attendance.  (Tr. 70.)

## IV.    The ALJ's Findings and Decision

On June 23, 2011, the ALJ issued an unfavorable decision concluding that

Plaintiff was not under a disability within the meaning of the Social Security Act at

any time from the alleged onset date of January 1, 2001, through the decision.

---

[3]      Mastbaum stated there were approximately 1,250 to 1,500 press tender
jobs in Minnesota and 75,000 nationally.  (Tr. 67.)

[4]      Mastbaum stated there were approximately 1,800 unscrambler jobs
between the beverage and dairy industries in Minnesota and 75,000 nationally.
(Tr. 67–68.)

[5]      Mastbaum stated there were approximately 2,000 conveyor off bearer jobs
in Minnesota and 100,000 nationally.  (Tr. 68–69.)

(Tr. 11.)  Therefore, the ALJ denied Plaintiff's application for disability insurance benefits and supplemental security income.  (Tr. 11–21.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  (Tr. 14); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform."  *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

The ALJ found that Plaintiff did work at a substantial gainful activity level in 2007, and during the period of April 1, 2010, through September 30, 2010. (Tr. 13.)  However, the ALJ found that there have also been continuing 12-month periods during which Plaintiff did not engage in substantial gainful activity. (Tr. 14.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "dysthymia, adult onset; post-traumatic stress disorder (PTSD);

12

adjustment disorder with anxiety; panic disorder without agoraphobia; and obsessive-compulsive disorder traits . . . ." (*Id.*) The ALJ also found that Plaintiff's hypertension did not qualify as a severe impairment because Dr. Christopher Balgobin believed Plaintiff's hypertension was stable and controlled with medication. (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14.) The ALJ concluded that Plaintiff had a mild restriction of daily activities and social functioning and moderate difficulties with concentration, persistence, and pace. (Tr. 14–15.) The ALJ also concluded that Plaintiff had no episodes of decompensation of extended duration. (Tr. 15.) Additionally, the ALJ found that the "C" criteria of the 12.02 and 12.04 listings were not met. (*Id.*)

At step four the ALJ concluded that –

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the [Plaintiff] is limited to simple, routine, repetitious work with one- or two-step instructions; the [Plaintiff] is limited to a supervised, low-stress environment requiring few decisions; the [Plaintiff] is limited to brief, infrequent, and superficial interaction with the public, co-workers, and supervisors.

(Tr. 16.) The ALJ made those findings after considering all of Plaintiff's symptoms and comparing them with the objective medical evidence and other evidence. (*Id.*) The ALJ also concluded that Plaintiff's impairments "could reasonably be expected to cause the [Plaintiff's] symptoms however, the

13

[Plaintiff's] statements concerning intensity, persistence, and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (Tr. 16–17.) The ALJ placed emphasis on Plaintiff's professed ability to work twenty-five hours per week and the mild-to-moderate symptoms Plaintiff experienced. (Tr. 17–18.)

The ALJ concluded that Plaintiff's daily activities of housework, grocery shopping, and computer use for gaming and dating services indicates a mental endurance sufficient to perform full-time work. (Tr. 17–18.) The ALJ also noted that Plaintiff rarely experiences exacerbation of her anxiety-related symptoms, as evidenced by her lack of concern regarding her panic attacks. (*Id.*) In addition, the ALJ noted that Robert Lopno, a licensed psychologist, opined that Plaintiff can work full-time with certain accommodations based on his personal observations of Plaintiff. (Tr. 19.)

Finally, the ALJ concluded that Plaintiff is able to work, and despite her nonexertional limitations, there are jobs in the national economy for an individual of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 20.) Therefore, the ALJ concluded that Plaintiff is not disabled. (*Id.*)

## DISCUSSION

### I.   Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199 (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere

search of the record for evidence supporting the [Commissioner's] findings." (*Id.*)
In reviewing the administrative decision, "'[t]he substantiality of [the] evidence
must take into account whatever in the record fairly detracts from its weight.'"
(*Id.*) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not
substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210,
1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision
merely because evidence may exist to support the opposite conclusion. *Mitchell
v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citation omitted); *see also Woolf*, 3
F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if
substantial evidence would support the opposite finding). The possibility that the
Court could draw two inconsistent conclusions from the same record does not
prevent a particular finding from being supported by substantial evidence.
*Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability
insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a);
*Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928
F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or
she cannot perform past work due to a disability, "the burden of proof shifts to the
Commissioner to prove, first that the claimant retains the residual functional
capacity to do other kinds of work, and, second that other work exists in

substantial numbers in the national economy that the claimant is able to do."

*Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

## II. Analysis of the ALJ's Decision

Plaintiff raises three issues in support of her motion for summary judgment. First, Plaintiff argues that the ALJ erred in not finding that "organic brain disorder" and borderline intellectual functioning were severe mental impairments affecting her. (Doc. No. 10, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 12–16.) Second, Plaintiff argues the ALJ erred in finding that her severe cognitive dysfunctional impairments did not meet or equal Listing 12.02, 12.04, or 12.06. (*Id.* at 16–19.) And lastly, Plaintiff argues that the ALJ erred in concluding that she is capable of working on a regular and continuing basis. (*Id.* at 19–21.)

In response, Defendant argues three things. First, that any error the ALJ made in determining Plaintiff's severe impairments was harmless. (Doc. No. 16, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 6–7.) Second, Defendant argues that Plaintiff's impairments do not satisfy the criteria of Listings 12.02, 12.04, or 12.06. (*Id.* at 7–16.) And third, Defendant argues that substantial evidence supports the ALJ's assessment of Plaintiff's RFC. (*Id.* at 16–20.)

### A. Whether the ALJ erred at Step Two when determining whether Plaintiff suffers from a severe mental impairment

An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform

basic work activities, whereas an impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  (Social Security Rulings ("SSR") 85-28, 96-3p.)  The ALJ stated that Plaintiff had the following severe impairments: "dysthymia, adult onset; post-traumatic stress disorder (PTSD); adjustment disorder with anxiety; panic disorder without agoraphobia; and obsessive-compulsive disorder traits."  (Tr. 14.)  Plaintiff asserts that the ALJ's omission of "organic brain disorder" and borderline intellectual functioning from the list of severe impairments suffered by her was an error.  (Pl.'s Mem. 12.)

Plaintiff, however, nowhere in her brief describes what she is referring to by "organic brain disorder."[6]  The only references to "organic brain disorder" by Plaintiff are (1) when she states that "Ms. Snyder and her mother, Julie Scherbenske, testified at length that Ms. Snyder was unable to work on a full-time basis because of mental impairments including . . . organic brain disorder . . . ." (Pl.'s Mem. 3), and (2) when she frames her first issue for argument as, "The ALJ erred in not finding organic brain disorder and borderline intellectual functioning were severe mental impairments affecting the claimant."  (Pl.'s Mem. 12.)  On pages 13 through 16 of her brief, Plaintiff then cites to various

---

[6]     "Organic brain syndrome (OBS) is a general term used to describe decreased mental function due to a medical disease, other than a psychiatric illness." *U.S. National Library of Medicine and National Institutes of Health*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001401.htm (last visited October 8, 2013).

reports and psychological test results that purportedly support finding that both organic brain disorder and borderline intellectual functioning were severe mental impairments for Plaintiff. (*See* Pl.'s Mem. 13–16.) But the Court has read the testimony of Plaintiff and her mother, and nowhere do they reference an "organic brain disorder." Further, although Plaintiff references Robert Lopno's evaluation in which he gave Plaintiff a GAF score of 48 and concluded that Plaintiff has a "Full Scale IQ of 75 which . . . is within the Borderline range . . . ." (Tr. 398–99), Kathy Lietzau's evaluation in which she diagnosed Plaintiff with borderline intellectual functioning and a GAF score of 45–50 (Tr. 475), and both Dr. Tanaka and Dr. Olson's reports that state concerns about Plaintiff's vulnerability and obsessive behaviors (Tr. 446, 448, 450, 452, 456), none of these reference an "organic brain disorder" either. Therefore, Plaintiff has not shown support for concluding that "organic brain disorder" should have been listed as one of Plaintiff's severe mental impairments.

A better case could be made for concluding that the ALJ should have included borderline intellectual functioning as a severe impairment suffered by Plaintiff. But even so, such an error for failure to find a severe impairment at Step Two is harmless if the claimant "makes a threshold showing of *any* 'severe' impairment [and] the ALJ continues with the sequential evaluation process and considers all impairments, both *severe and nonsevere.*" *Bondurant v. Astrue*, No. 09-cv-328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010) (emphasis in original). That is just what the ALJ did here. The ALJ considered

both borderline intellectual functioning and "chronic organic mental disorder" during her Step Three and RFC analyses. (*See* Tr. 15–17.) Accordingly, the ALJ did not commit reversible error in failing to include borderline intellectual functioning or organic brain disorder as additional impairments at Step Two. *See Johnson v. Comm'r of Soc. Sec.*, No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.").

### B. Whether the ALJ erred in finding that Plaintiff's severe cognitive dysfunctional impairments did not meet or equal Listing 12.02, 12.04, or 12.06

In order to meet the paragraph B criteria for Listing 12.02, 12.04, or 12.06, the mental impairment must satisfy at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social function; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, App. 1 §§ 12.02(B), 12.04(B), 12.06(B). The ALJ found that Plaintiff had mild restrictions in daily living and social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 14–15.)

### i. Plaintiff's Difficulties in Daily Activities

Plaintiff argues that the evidence shows that she has moderate to marked difficulties in daily living, and but for the assistance from her mother the

difficulties would be extreme. (Pl.'s Mem 17.) Plaintiff points out that her mother

visits four to five times per week and asserts that Plaintiff would be unable to

care for her children without her mother's support or the support of a neighbor.

(*Id.* at 16–17.) Plaintiff also asserts that if her schedule is not maintained strictly,

she can suffer anxiety attacks, and, in addition, Plaintiff points out that her

mother stressed that without her help Plaintiff would be unable to work on her

own. (*Id.* at 17.)

Defendant, on the other hand, argues that Plaintiff does not experience

any marked restrictions. Defendant points to the evidence the ALJ relied on,

specifically that –

> [i]n activities of daily living, [Plaintiff] has mild restriction. [She]
> testified that she currently works part-time [Tr. 37] and that she has
> worked up to 25 hours a week [Tr. 35], including some 8-hour
> workdays. [Tr. 41.] [Plaintiff] stated that she cares for her two
> children, including waking them in the morning, bathing, dressing,
> and feeding. [Tr. 245, 246, 253, 254.] [She] testified that she plays
> video games [Tr. 46–47] and uses an online dating service. [Tr. 47.]
> In January 2010, Julie Scherbenske, [Plaintiff's] mother and
> guardian, reported that [Plaintiff] cares for a cat, including feeding it
> and cleaning its litter box. [Tr. 246.] Ms. Scherbenske also reported
> that [Plaintiff] had no difficulties with personal care, including
> dressing, bathing, hair-care, eating, or using the toilet. [Tr. 246.]
> Ms. Scherbenske reported that [Plaintiff] does cleaning and laundry.
> [Tr. 247.] In January 2010, [Plaintiff] reported that she vacuums and
> cleans dishes. [Tr. 255.] While [Plaintiff] reported that she
> experienced occasional feeling of depression or anxiety around
> others, the overall record indicates that she participates in several
> activities of daily living.

(Tr. 15; *see* Def.'s Mem 8.) In addition, Defendant lists other examples of

activities Plaintiff performs, such as that she prepared meals every day and

shopped for groceries one to two times per week (Def.'s Mem 8), and points to

Dr. Tanaka's assessment that Plaintiff "has many great skills, including personal

and domestic daily living skills."  (Tr. 456.)  Finally, Defendant argues that

Plaintiff's reliance on her mother is overstated with respect to managing her

anxiety, pointing to the medical record showing that her scores in the past

reflected only moderate anxiety.  (Def.'s Mem. 9.)

This Court concludes there is substantial evidence in the record to support

the ALJ's finding that Plaintiff suffers only mild difficulties with daily activities.

The ALJ properly found that Plaintiff is able to perform daily activities at a level so

that she can take care of herself and her children.  (Tr. 14–15.)  The ALJ's

findings additionally reference many activities including daily grooming and

hygiene, meal preparation, cleaning, laundry, etc.  The ALJ need not determine

that Plaintiff experiences no difficulties in daily living activities, only that the

difficulties are not "marked."  *See* 20 C.F.R. Part 404, Subpart P, App. 1

§§ 12.02(B), 12.04(B), 12.06(B).  Here, there is substantial evidence to support

such a finding by the ALJ.

### ii.  Plaintiff's Difficulties in Social Functioning

Plaintiff also argues that her social functioning difficulties are extreme.

(Pl.'s Mem. 17.)  As evidence, Plaintiff points to psychological evaluations from

Drs. Olson, Tanaka, Cranbrook, and nurse Kathy Lietzan that describe her as

vulnerable in social functioning.  (*Id.*)  In addition, Plaintiff points to an incident in

which a 14-year-old boy was able to convince her to buy him alcohol and cigarettes. (*Id.*)

Defendant disagrees that Plaintiff suffers from extreme limitations in social functioning. Defendant counters Plaintiff's diagnoses of vulnerability from Drs. Olson, Cranbrook, Tanaka, and nurse clinical specialist Kathi Lietzau by arguing that each of those medical professionals only met with Plaintiff once. (Def.'s Mem 10.) Defendant cites *Curtis v. Astrue*, 338 Fed. Appx. 554, 555 (8th Cir. 2009), which supports the position that a one-time consultation with a physician does not hold significant evidentiary weight, and *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011), which holds that an ALJ's decision can differ with the opinions of medical professionals if the record as a whole conflicts with the medical professional's opinion. Here, Defendant asserts that the ALJ found exactly that, stating:

> [Plaintiff] has reported panic attacks, but the overall record indicates
> that she can adequately participate in social interaction. [Plaintiff]
> testified that she enjoyed greeting customers at Wal-Mart and
> helping them to find items in the store. [Tr. 36.] In January 2010,
> [Ms. Scherbenske] reported that [Plaintiff] talks on the phone with
> friends a couple times a week. [Tr. 249.] Ms. Scherbenske also
> reported that [Plaintiff] goes to church and social events with her
> family. [Tr. 249.] While [Plaintiff] has been married and divorced,
> she has also participated in dating services such as eHarmony.
> [Tr. 47.] [Plaintiff] has demonstrated the ability to act appropriately in
> work situations and in everyday life, indicating that she has no more
> than mild difficulties in this area.

(Tr. 15; *see* Def.'s Mem 11.) Defendant also provides other examples of Plaintiff's successful social functioning and points to Plaintiff being assessed with

a GAF score of 65 by both Dr. Tanaka and Dr. Olson, which indicates only mild psychological symptoms.  (Def.'s Mem. 11–12; Tr. 448, 456.)  Furthermore, Defendant argues that Plaintiff's arrest for providing alcohol and cigarettes to a minor should not be a significant factor in the decision regarding Plaintiff's social functioning because it was a one-time brush with the law, and since charges against Plaintiff were dropped, the facts of the event were not adequately developed leaving only Plaintiff's version of the facts.  (Def.'s Mem 12–13.)  For these reasons, Defendant asserts that the ALJ properly found Plaintiff's social functioning impairment to be mild.

The ALJ's conclusion that Plaintiff is only mildly impaired in social functioning is supported by substantial evidence.  As stated above, the ALJ may reject medical opinions where the weight of the evidence conflicts with the medical opinion.  *See McCoy*, 648 F.3d at 616.  Here, the ALJ pointed to Plaintiff's work history in which she testified that she was "greeting customers at Wal-[M]art and helping them to find items in the store" (Tr. 15, 234), that she maintains a social life with friends and within her church (Tr. 15), and that she has pursued romantic relationships.  (Tr. 15, 47.)  This is all evidence that conflicts with a finding of more than mild impairment.  In addition, the incident with the 14-year-old boy should not be given weight by the ALJ because "[t]he Social Security Act generally precludes consideration on review of evidence outside the record before the [Commissioner]."  *Delrosa v. Sullivan*, 922 F.2d 480, 483 (8th Cir. 1991) (citation omitted).  For all these reasons, the record

substantially supports the ALJ's conclusion that Plaintiff has mild difficulties in social functioning.

### iii. Plaintiff's Difficulties in Concentration, Persistence, and Pace

Plaintiff additionally argues that she has marked to extreme difficulties in concentration, persistence, and pace. (Pl.'s Mem. 19.) Plaintiff points to her inability to work full-time due to anxiety and feelings of being overwhelmed and her need for a job coach to have success at part-time employment. (*Id.* at 18.) Plaintiff also accuses the ALJ of ignoring the opinions of medical specialists who diagnosed Plaintiff with difficulties in concentration, persistence, and pace, and giving too much weight to the opinion of Dr. Balgobin, a general practitioner. (*Id.*) Plaintiff argues that this was inappropriate because ALJs should give more weight to the opinion of specialists, rather than non-specialists. (*Id.* (citing 20 C.F.R. § 404.1527(c)(5)).)

Defendant agrees with the ALJ's determination that Plaintiff has moderate difficulties in concentration, persistence, and pace. (Def.'s Mem. 13–15.) In support, Defendant points to psychologist Robert Lopno's conclusion that Plaintiff was able to "sustain adequate attention and concentration" (Tr. 399), Dr. Balgobin's opinion that Plaintiff "demonstrated no impairment in immediate, recent, or remote memory" (Tr. 307), and psychologist Joanne Nahem's opinion that Plaintiff had no impairment in concentration. (Tr. 383.) Defendant adds that

Plaintiff met with Joanne Nahem more times than she met with Drs. Olson, Cranbrook, and Tanaka combined. (Def.'s Mem. 14.)

This Court concludes that, based on the record evidence, the ALJ properly found that Plaintiff had moderate difficulties with respect to Plaintiff's concentration, persistence, or pace. Plaintiff relies on the opinions of specialists who determined she suffered from significant difficulties in concentration, persistence, or pace, and argues that the ALJ gave improper weight to the opinion of Dr. Balgobin, who is not a specialist, in conflict with 20 C.F.R. § 404.1527(c)(5). (Pl.'s Mem. 18.) However, the ALJ discussed not only Dr. Balgobin's opinion but also Plaintiff's testimony about her ability to play video games and at times work 8-hour days. (Tr. 15.) And other medical professionals, including Joanne Nahem and Robert Lopno (both psychologists, i.e., specialists) determined that Plaintiff's impairments were not severe. (Tr. 383, 399.) Accordingly, there is substantial evidence in the record to support the ALJ's finding.

### C. Whether the ALJ erred in assessing Plaintiff's RFC

Plaintiff correctly states that the ALJ "must determine a residual functional capacity which is essentially an 'assessment of an individual's ability to sustain work-related physical and mental activities in a working setting on a regular and continuing basis.'" 20 C.F.R. § 404.1545. A regular and continuing basis means eight hours a day for five days a week or an equivalent work schedule. (SSR 96-8p.)

Plaintiff argues that there is not substantial evidence in the record to support that she is able to work on a "regular and continuing basis." (Pl.'s Mem. 19.) She points to the fact that she has never worked more than part-time in her life and that even then she required assistance from her mother and a job coach to perform in those positions. (*Id.* at 20.) Plaintiff also points to her GAF score of 48, as assessed by psychologist Robert Lopno, and argues that her full history of GAF scores should be considered. (*Id.* at 21.) Finally, Plaintiff again argues that the ALJ ignored the opinions of Drs. Tanaka, Olson, and Cranbrook. (*Id.*) Defendant counters that the ALJ properly concluded that Plaintiff was able to perform a full range of work at all exertional levels, and points to the fact that Plaintiff has worked 20-25 hours per week in previous positions and has occasionally put in 8-hour days, therefore indicating that Plaintiff actually can work full time. (Def.'s Mem 16.)

This Court concludes that the ALJ properly assessed Plaintiff's RFC by finding that Plaintiff could work on a regular and continuing basis, with certain nonexertional limitations. It was not error for the ALJ to place "great importance" on Plaintiff's "professed ability to work up to 25 hours a week over the past several years." (Tr. 17); *see Lundgren v. Astrue*, No. 09-cv-3395 (RHK/LIB), 2011 WL 882084, at *9 n.4 (D. Minn. Feb. 7, 2011) ("While part-time work, by itself, cannot support an ALJ's decision, in the present case the ALJ was merely indicating his belief that Lundgren's ability to engage in part-time employment was relevant in assessing whether she is capable of engaging in fulltime, gainful

employment."). Moreover, the ALJ also gave great weight to the medical opinion of psychologist Lopno who concluded that Plaintiff is –

> . . . able to understand, remember, and follow at least rehearsed instructions; sustain adequate attention and concentration; carry out work-like tasks with reduced to adequate persistence and pace; respond appropriately to brief and superficial contact with co-workers and supervisors; and tolerate only mild stress and pressure typically found in an entry-level work place.

(Tr. 19, 399.) The ALJ relied on Lopno's testimony as well as Plaintiff's daily living activities, work history, medical evidence, and the improvement Plaintiff experienced with medication to conclude that Plaintiff is capable of working on a regular and continuing basis. (Tr. 16–19); *see Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012) *"*([I]f the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination." (citation omitted)). Finally, the ALJ did not ignore the assessments from Drs. Tanaka, Olson, and Cranbrook. Rather, they were included in the ALJ's discussion of the case and therefore must have been taken into account by the ALJ, with the exception of Dr. Cranbrook whose opinion had not yet been made at the time the ALJ issued her opinion. (*Id.*) Further, the ALJ recognized the difficulties Plaintiff has with dysthymia, PTSD, adjustment disorder, and panic disorder, but concluded that her symptoms "have been no

more than mild to moderate" (Tr. 18), and the ALJ took these into account when crafting the nonexertional limitations for Plaintiff in her RFC.

As a whole, there is substantial evidence to support the ALJ's findings in each of the contested areas. As such, this Court recommends that the ALJ's decision be upheld.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 9), be **DENIED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 15), be **GRANTED**; and

3.    This case be **DISMISSED WITH PREJUDICE**, and judgment be entered.

Date: October 10, 2013

     _s/ Jeffrey J. Keyes_
     JEFFREY J. KEYES
     United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 24, 2013** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall

make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute on order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.